Filed 12/4/25  In re K.H. CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re K.H. et al., Persons Coming Under the Juvenile Court Law.

RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,

    Plaintiff and Respondent,

v.

B.M.,

    Defendant and Appellant.

E084599

(Super.Ct.No. SWJ1300837)

OPINION

APPEAL from the Superior Court of Riverside County.  Elizabeth E. Tucker, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed with directions.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

**INTRODUCTION**

Blanca M. (Mother) appeals from an order made at a family maintenance review hearing conducted pursuant to Welfare and Institutions Code[1] section 364, at which the juvenile court ordered removal of her children. On appeal, Mother argues the children were erroneously removed pursuant to section 364 and that reversal is required because compliance with the inquiry obligations of the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) has not been completed. We affirm with directions.

**BACKGROUND**

On May 8, 2023, the Riverside County Department of Public Social Services (DPSS or Department) received a referral alleging general neglect of the children, Isaa.M. (Minor 1), Isai.M. (Minor 2),[2] both age 8 at the inception of this dependency, C.M. (Minor 3, age 7), Kah.H. (Minor 4, age 5), and Kar.M. (Minor 5, age 2), by the parents Mother and William H. (Father). It was reported that Minor 1 and Minor 2 had been absent from school for a few days. When Minor 1 returned to school, he reported that his parents were working on the car when Minor 3 hit Minor 1 on the head with a crowbar and Mother dropped a car jack on Minor 1's foot. Then Minor 1 stated the Father ran over his foot with the car.

Minor 3 denied hitting Minor 1 with a crowbar but indicated he had tried to remove a board and Minor 1 got in the way. Regarding Minor 1's complaint that Mother

---

[1] All further statutory references are to the Welfare and Institutions Code except where otherwise indicated.

[2] Minor 1 and Minor 2 are twins.

dropped a car jack on Minor 1's foot, both Minor 1 and Minor 3 told the social worker that while moving the car, Father had run over Minor 1's foot, although there were no apparent injuries. The social worker examined Minor 1's foot and found no bruises or marks on it. Minor 1 later denied that Mother dropped a car jack on him in speaking to the social worker but continued to state that Minor 3 accidentally hit Minor 1 in the head with a crowbar.

On August 16, 2023, DPSS received a secondary referral regarding the family because Minor 3 had missed four days of school. The children's schools indicated that Minor 1 and Minor 2 had also missed four days of school. When Minor 3 returned to school, Minor 3 had multiple visible injuries on his face and arms, consisting primarily of healing bruises. Minor 3 attributed the injuries to his siblings, including a cut above one eye which he indicated was caused when one of his siblings broke a broom causing a piece to fly up and hit Minor 3. There was also a report that Minor 3 had walked, unescorted, to the school bus from the home, when, as Mother explained, the maternal uncle (Mother's brother) was supposed to accompany Minor 3.

Subsequent investigation revealed that the children had missed a significant amount of school the previous year. Mother explained that if one child were sick, she would keep the other children home because they would get each other sick. The jurisdiction report concluded that the children played together in a rough manner and often ended up with bruises and injuries as a result, because the parents failed to adequately supervise the rambunctious children.

3

The social worker interviewed Mother who was pregnant with a child by a different father, in which Mother indicated she planned to relinquish the unborn baby for adoption because she was unable to provide or care for another child. Mother identified Father as the Father of the five children involved in the current referral.

At the time of the referrals, Father reported he did not live in the home, and only visited to see the children and help the Mother with projects. When the social worker asked him to submit to a drug test, Father declined, so the social worker contacted his probation officer, who ordered two drug tests, both of which were positive for methamphetamine.

The family had a prior welfare history that included a 2013 dependency involving Mother's four older children (identified in the record as L.A., A.A., R.A., and A.M.) along with Minor 1, Minor 2, and Minor 3, based on allegations relating to Mother's substance abuse and neglect. The parents successfully reunified with the children, resulting in termination of the dependency in November 2015. Another dependency was initiated in 2017 based on allegations of inappropriate corporal punishment of A.M. and neglect by Mother and the father of the four oldest children. In connection with the 2017 dependency, Mother was charged with child cruelty and was incarcerated. Mother's parental rights to A.M. were terminated in that dependency, while the father of L.A., A.A., and R.A. regained legal and physical custody of those three children. Mother regained sole legal and physical custody of Minor 1, Minor 2, and Minor 3 upon the termination of that dependency in 2019.

4

Respecting the current circumstances, the social worker interviewed Minor 3, who was playing with a plastic hanger that he had found outside, trying to put it over his head and around his neck; during the interview Minor 3 tended to go off topic. When the social worker commented about Minor 3's interview to Mother, Mother informed the social worker that he was diagnosed with ADHD (attention deficit hyperactivity disorder), but Minor 3 had not taken his medication due to a shortage of Adderall. Although the social worker advised Mother to consult Minor 3's doctor about an alternative medication, the doctor advised Mother against changing Minor 3's medication.

Mother also reported that Minor 3 was in special education with an IEP (Individualized Educational Program) with notes that Minor 3 lacks safety awareness and is impulsive. A neighbor came to Mother's home during the social worker's visit and reported that while Minor 3 is protective of younger children, Minor 3 fights with his siblings in front of the neighbor and the Mother, and they have to tell the boys to stop. During the social worker's home visit, Minor 3 had a meltdown in the master bedroom, banging his head against the wall and kicking it. While the social worker spoke to the Mother, Minor 3 exited the house smiling. Mother also reported that Minor 3 kills lizards by stabbing them in the eye with sticks.

Mother informed the social worker that while she was incarcerated in connection with the prior child cruelty charges, she was diagnosed with depression, but she was not currently receiving services for the condition. During the interview, the social worker

5

also inquired about a complaint that Mother and the children were at a gas station asking for money, which Mother denied.

The Department was concerned about Father's drug use and Mother's inability to protect the children, given the numerous injuries they sustained, as well as Mother's ability to supervise them. After investigating the referrals, the social worker informed Mother that the children would remain out of custody in her care but would be removed from Father.

The detention report also indicated that the social worker asked Mother about Native American heritage, but that Mother denied having Indian ancestry. Mother and her family moved to the United States from Mexico when Mother was seven years old; the maternal grandmother returned to Mexico, where she has remained. The report indicates that one of Mother's brothers, Edwin C., lived with Mother, one brother lives in Mexico and a third brother was incarcerated. The maternal great-grandmother, who was recently deceased, had also lived in Mexico. Although the Department interviewed the Father and Edwin C., while investigating the current referrals, there is no indication that the Department asked those parties about Native American ancestry.

On September 18, 2023, the Department filed a new dependency petition alleging child abuse and neglect against Mother and Father under section 300, subdivisions (a), (b)(1) and (j) based on the Father's act of running over Minor 1's foot (paragraphs a-1 and b-1); Father's unresolved history of abusing controlled substances (paragraph b-2); Mother's history of unresolved mental health issues which allegedly resulted in the

6

children missing school or being injury prone (paragraph b-3); Mother's inability to exercise effective control over Minor 3, who has ADHD, Mother's inconsistent administration of Minor 3's medication leading him to have melt downs and being injury prone, Father's act of running over Minor 1's foot, Minor 5 receiving a cut on her hand that required stitches, and the children's conduct of throwing rocks at each other (paragraph b-4); Mother's prior dependency history related to substance abuse and neglect (paragraph b-5); Father's previous dependency history related to his substance abuse (paragraph b-6); Mother's prior conviction for child cruelty in 2017 (paragraph b-7); Father's criminal history for child cruelty in 2017 (paragraph b-8); and the fact that Minor 1's siblings were at risk of injury due to abuse or neglect (paragraph j-1).

At the detention hearing on September 19, 2023, the children were detained from the Father and left in the custody of the Mother. Mother was present at the hearing, but Father was not, when the court found that DPSS had asked each participant whether they know or have reason to know that the children are Indian children, and it found there was no reason to believe or to know that the children were Indian children; it concluded that ICWA did not apply. The children were detained from Father, but maintained in their placement with Mother.

The petition was amended on October 24, 2023, to strike out the allegations of paragraphs b-3 (the allegation relating to Mother's mental health) and b-4 (alleging Mother's inability to exercise effective control over Minor 3), and adding allegations that Mother has a history of depression and is apathetic toward parenting, lacking structure

7

and boundaries for the children (paragraph b-9), that Father has failed to provide adequate supervision or a structured environment (paragraph b-10), and that Mother should have known of Father's substance abuse but was unable to recognize the signs of use and allowed Father to have access to the children (paragraph b-11).

Prior to the jurisdiction hearing, the social worker filed an addendum report in which she recommended that, in addition to striking paragraphs b-3 and b-4, the court should find the allegations pursuant to section 300, subdivisions (a) and (j) (paragraphs a-1 and j-1) be found not true. The report indicates that the social worker interviewed the children, all of whom reported they felt safe with Mother. Minor 3 had a black eye that he attributed to tripping and falling on a rock while playing with his siblings. Minor 3 indicated that Mother put an ice pack on his eye. The social worker expressed continued concern about Mother's ability to provide a structured environment for the children.

When the jurisdiction hearing was again continued to await results of Father's hair follicle testing, the social worker submitted another addendum report. This report revealed that an immediate response referral had been received regarding suspected physical abuse of Minor 3, who came to school with another black eye on the same eye that had been injured previously. On this occasion, Minor 3 reported the injury was sustained when he got into a fight with one of his siblings, but the reporting party was concerned about multiple black eyes during the year. The reporting party also indicated Minor 3 had fallen asleep at school.

When interviewed by the emergency response social worker, Minor 3 reported that a school friend had pushed him off the monkey bars and that he fell on his face. Minor 3 also stated that he had fallen off a trampoline when pushed by Minor 4 and Minor 3 had cuts on his hand from hitting a tree. Minor 3 also indicated that his uncle, Edwin C. had accidentally given Minor 3 a white pill, which is normally taken at night to help Minor 3 fall asleep, in the morning by mistake making Minor 3 sleepy at school. Edwin C. corroborated this information about Minor 3's injuries. Edwin C. also indicated that the children are very hyperactive and always getting themselves hurt by running and falling. A subsequent child abuse medical exam noted Minor 3 had numerous cuts, scrapes, bruises and scars, so the nurse practitioner who conducted the exam recommended a forensic interview, which took place the next day. In that interview Minor 3 maintained he had sustained all injuries due to rough housing with his siblings.

The social worker also indicated that Mother had reported taking Minor 4 to the emergency department because Minor 3 had taken a metal bar from the bedframe and threw it like a spear, which, when it hit the concrete, ricocheted and hit Minor 4 in the face, causing a cut and a black eye. The day before this incident, Mother had to take Minor 3 to urgent care because he had been hit in the face with the bathroom door while fighting with Minor 2, sustaining another black eye as well as a vertical cut that ran from Minor 3's forehead to his lip. During a video chat with the children, the social worker could hear them fighting in the background. On December 28, 2023, the social worker

9

made an unannounced visit and noted that the children had each received a bicycle for Christmas and that every child had crashed on their bikes.

The contested jurisdiction/disposition hearing took place on January 18, 2024. The court struck out the allegations of paragraphs b-3 and b-4 (relating to Mother's alleged history of mental health issues and her inability to exercise effective control over Minor 3) and found the allegations of paragraphs a-1, b-1, and j-1 (relating to alleged abuse of Minor 1 when Father ran over his foot and concomitant risk to his siblings) were not true. The remaining allegations were found true, and the children were declared dependents of the court with physical custody of the children maintained by Mother subject to DPSS supervision under a plan of family maintenance services. The children were removed from Father's custody, and he was denied reunification services.

On July 5, 2024, the social worker submitted a family maintenance status review report pursuant to section 364, recommending that the children remain placed with Mother and that she receive an additional six months of services. The report included continuing concern regarding Minor 3 having bruises or cuts due to rough play and being outside, in addition to Minor 3's diagnosis of ADHD for which he is prescribed Adderall and Clonidine. The social worker described Minor 3 as energetic and accident prone, and indicated Minor 3's therapist was concerned about Minor 3's attention span and his ability to focus.

The report also indicated that in May 2024, DPSS received a referral regarding physical abuse and poor supervision, but the referral was closed as unfounded. The

report also noted that Mother was unable to participate in therapy or counseling due to the closure of the location to which she had been referred and the lack of reliable internet connection access. Mother continued working with the wrap-around team and parent partners but felt overwhelmed with caring for and supervising the needs of her children. Mother had extended family support but felt her duties as a single parent go beyond her capacity to ensure the safety of the children.

The report also commented that the desert landscape where the family resides poses safety risks and the home needed significant repairs for which there are no services available because Mother did not qualify for housing assistance. Wrap-around services assisted with home repairs that posed a safety risk, such as, broken windows and a punctured sewage pipe, but other home conditions had delayed Mother's progress in services. The social worker indicated Mother needed additional support services to develop skills for establishing boundaries and enforcing consequences, as well as creating a structured environment for the children's safety. Additionally, the social worker suggested behavioral therapy to address the marks and bruises on the children resulting from unsupervised and dangerous play.

On July 18, 2024, the matter was called for hearing on the family maintenance status review. After Mother submitted based on the report and the social worker's recommendations, new counsel was substituted for the minors' previous counsel. Minors' counsel indicated that her investigator, a former child protective services worker and Palm Springs police officer had visited the home and reported the home was in

11

deplorable conditions and infested with rodents, and that the children had bruises all over their bodies. Counsel also relayed that the investigator was stricken by the fact Mother would bite Minor 5's face whenever the child cried. The investigator did not believe the children were safe in the home.

The court described that minors' counsel was making an oral section 388 motion to modify the prior order of placement and to remove the children, but the request could not proceed as an oral application unless all counsel waived the requirement of a verified petition. Based on Mother's objection, the court denied the oral motion to modify the placement of the children.

On July 23, 2024, the matter was again continued, pending receipt of results of a forensic examination. At this hearing, minors' counsel indicated she had e-filed a formal petition requesting that the children be removed from Mother's custody.[3] An addendum report filed on the date of this hearing continued to recommend that the children remain placed with Mother with an additional six months of family maintenance services. The report did not mention a petition filed by minors' counsel and the court did not refer to it in commencing the hearing as a matter pending before it.

On August 12, 2024, another addendum report was filed, and it, too, recommended that the children remain placed with Mother with additional family maintenance services. At the hearing conducted on August 13, the Department submitted on its reports and the recommendation of its most recent addendum report. The report did not refer to any

_____

[3] This document is not included in the record on appeal.

motion or petition filed by minors' counsel. Minors' counsel objected to the recommendation of the social worker and requested that the matter be continued for receipt of the forensic examination reports.

On September 4, 2024, the date set for the continued family maintenance status review hearing, the court conducted an evidentiary hearing. On that date, the social worker submitted an amended recommendation attachment (with no new addendum report), now recommending that the court detain the children from Mother. The court noted it had reviewed the medical reports relating to Minor 4 and Minor 5, as well as some photographs. No reference was made by the court or any of the parties to a pending section 388 petition. However, minors' counsel, in referring to the exhibits submitted to the court, indicated the photographs were submitted on "the date that I was asking for removal and then we set it for contested."

At the hearing, the Court inquired if everyone was prepared to move forward, and all counsel indicated they were. The court noted that the social worker's report recommended continued family maintenance services and supervision with custody maintained with Mother, but counsel for the Department stated it now supported the request by minors' counsel to remove the children. At this point, Mother's counsel inquired if a section 387 petition was going to be filed, to which the court responded it did not think so. Mother's counsel then reminded the court that the last report recommended continued family maintenance, and that, unless something was filed that counsel had missed, there was no new addendum recommending removal from Mother.

13

The court, noting that the Department had recommended removal in its amended recommendations filed on the date of the hearing, agreed that, procedurally, if the Department were requesting removal, "they should be filing a 387 [petition]," although it acknowledged that minors' counsel had made a request for removal at the July hearing. At that point, the Department's counsel, acknowledging the procedural anomaly, clarified that the request for removal was not made by the Department, but that, considering the new information provided by minors' counsel, the Department now supported that request for removal. With no further objection by Mother, the court allowed minors' counsel to proceed with the contested request for removal.

Minor's counsel called her investigator who testified about observations made during a visit to Mother's residence to interview the children on July 16, 2024. This investigator has work experience as an emergency response unit member for child protective services in two counties before becoming a police officer, and after her retirement from the police department, she became a private investigator. The investigator went to the family's residence where she found all the children were covered in bruises. Some of the bruises were obvious grab marks; Minor 5 had bruises on the inside of her thigh, Minor 4 had bruises on her side just above her hips, and Minor 3 had bruising from his head to his ankles. Also, the home was not clean.

While at the residence, the investigator gave Mother one of her business cards, which Minor 5 put into her mouth. The Mother yelled at Minor 5 to spit it out, chased Minor 5 around the house, finally caught her, sat down at the table where the investigator

was sitting, had Minor 5 sit on her lap and yelled at the child to, "'Spit it out,'" but Minor 5 refused. The Mother leaned forward and bit Minor 5 on the cheek. The investigator indicated she could see Minor 5's cheek between Mother's teeth, eliminating any ambiguity about what she observed, and denying that it was a loving nuzzle from Mother. The investigator observed Mother doing this four times, at which point the investigator told Mother to stop. After this visit, the investigator contacted the social worker.

At a second visit, the children revealed that a male named "Ted" was living in the residence, but that Mother had instructed the children not to reveal any names. The investigator did not see a man in the home on either visit, and Mother indicated that Ted was the name of her church friend's husband. The home was just as dirty with debris and trash on the floor, dirty dishes overflowing from the kitchen sink, and exposed wiring from an outlet in the bathroom. The investigator also learned that Minor 3 had missed an entire week of school because he had been bitten by a dog. The other children had also missed a significant amount of school.

At the conclusion of the hearing, the court adopted the amended recommendations submitted by the social worker and granted minors' counsel's request to have the children removed from Mother's custody. The court ordered Mother to release the children to DPSS. The court found that the children were not Indian children. The court ordered family reunification services for Mother and approved a request for a psychological evaluation of Mother.

15

On September 6, 2024, a supplemental petition was filed pursuant to section 387, alleging the previous disposition had been ineffective in the protection or rehabilitation of the children. Specifically, the supplemental petition alleged the Mother continued to show poor parenting and supervision, such that while in the care of the Mother, the children continue to present with multiple injuries including bruising, cuts, and scratches throughout their faces and bodies; in addition, the "Child Physical Abuse and Neglect" exams of Minor 4 and Minor 5 indicated that the injuries were suspicious for inflicted trauma and physical abuse (paragraph s-1). The petition also alleged that despite services granted, the Mother has failed to construct a setting where the children have rules, consistency, and limits which results in the children missing school, getting hurt, and running amok, and that such conditions endanger the children's safety (paragraph s-2).

A detention report filed the same day (two days after the actual hearing at which the children were ordered detained) indicated that Minor 1, Minor 2, and Minor 3 were placed with a maternal aunt, while Minor 4 and Minor 5 were placed in a foster home. The report indicated that Mother had tried to care for the children but was overwhelmed at times. The family lived in a remote area where the children were allowed considerable freedom in their play and the Mother's inconsistent supervision allowed them to roam unsupervised. Additionally, the children's rough play in the isolated setting has led to exposure of the children to environmental hazards resulting in physical injuries.

Mother denied any physical abuse of the children and the children corroborated her denials, but the social worker stated the situation nonetheless requires significant

16

concern. Attached to the detention report was a report of the bone survey performed on Minor 5 which revealed no fractures, new, or healing.

On September 9, 2024, the court conducted the detention hearing, at which Mother denied the allegations of the supplemental petition.[4] The court found a prima facie showing had been made respecting the supplemental petition and concluded that continuance in the Mother's home was contrary to each child's welfare and that there was a substantial danger to the physical health of the children. The court also found there is no reason to believe or reason to know the child is an Indian child and that ICWA did not apply.

---

[4] Mother appeared at this hearing for which there is no reporter's transcript included in the appellate record. We therefore cannot tell if Mother acquiesced in the continued detention of the children out of her home.

On February 10, 2025, we granted Mother's request for judicial notice of two postjudgment minute orders, which includes a minute order from October 29, 2024, at which the supplemental petition was dismissed on the court's own motion on October 29, 2024, due to procedural errors regarding the filing of the section 387 petition. The appellate record does not provide information about the procedural basis for an order for reunification services, given the dismissal of the supplemental petition prior to adjudication of the claims forming the basis for the allegation that the previous disposition had been ineffective. The record also does not include a petition to modify a prior court order, such as is required to elevate the level of placement. (See *In re Anna S.* (2010) 180 Cal.App.4th 1489, 1501–1502, noting that the "Agency . . . may detain a child and file a section 387 petition to place the child in a higher level of care if it believes the prior placement has not been effective in protecting the child," and that "Minor's counsel, the parents and other interested parties may also file a petition under section 388" to seek a modification.) As an order removing custody without exigent circumstances, a protective custody warrant, or an adjudicated supplemental petition, the order directing Mother to release her children is distinctively unusual, no matter how wanting Mother's parenting skills may be.

Mother appealed from the orders made at the family maintenance review hearing on September 4, 2024.[5]

## DISCUSSION

1.  ***Whether the Minors Were Improperly Removed at the Family Maintenance Status Review Hearing***

    a.  *The Parties' Positions and Additional Background*

Mother argues that at the six-month status review of a family maintenance plan, the court lacked authority to order removal or detention of the children.  Mother also argues that a section 388 petition is a necessary prerequisite to modification of the disposition order maintaining a child with his or her parent.  (*In re Natasha A.* (1996) 42 Cal.App.4th 28, 34–35.)

The Department does not address this point but, instead, argues that whether section 364 contemplates only a decision to either dismiss the dependency or continue family maintenance services is immaterial because removal of children is governed by section 361, and the juvenile court in this case removed the children under that authority, for their protection.  We disagree with the Department's reliance on section 361, but agree the juvenile court had authority to make its order at the family maintenance review hearing.

---

[5] We also take judicial notice of the minute orders dated October 1, 2024, October 29, 2024, and March 4, 2025, that were attached to this court's order filed July 1, 2025.

18

Mother is correct in arguing that a modification petition pursuant to section 388 is normally required as the procedural vehicle for a request by minors to modify the disposition order which maintained the children in Mother's custody. The parties were apparently aware of this when, on July 18, 2024, minors' counsel informed the court of the findings of her private investigator and requested an evidentiary hearing. At that time, the court informed counsel of the need to file a section 388 petition to change the placement unless all parties waived the requirement. Mother did not waive the requirement, so minors' counsel indicated she "would ask we set this for a formal hearing then."

The court denied the oral request to modify the placement, inviting minors' counsel to "file something." Minors' counsel indicated she planned to do so, and the matter was continued to July 23, 2024. No petition or written motion was filed, and, while the hearing was conducted as a contested matter, the preceding minute orders do not reflect the setting of a contest. Thus, the record on appeal includes no section 388 petition by minors' counsel, although minors' counsel submitted forensic reports, photographs and a witness. Nor was a supplemental petition pursuant to section 387 filed by the Department, or an application for protective custody warrants to support the removal of the children. As Princess Buttercup acknowledged in "*The Princess Bride*"[6] they "sort of skipped that part."

---

[6] William Goldman, The Princess Bride (1973) Ballantine Books (film released by 20th Century Fox 1987).

We requested supplemental briefing to obtain responses to the following questions: (1) Is the current appeal moot by reason of subsequent procedural events relating to the change of Mother's case plan from family maintenance to family reunification and her participation in family reunification services? (2) Is the legality of the children's detention from Mother's care and custody independently reviewable on direct appeal? (See *In re B.P.* (2020) 49 Cal.App.5th 886, 889–890 [detention order made in connection with a subsequent petition pursuant to section 342 is interlocutory and nonappealable].) (3) Has Mother forfeited any claim of error regarding the interlocutory detention orders by acquiescing in the continued out-of-home placement and failing to request return of the children upon dismissal of the supplemental (§ 387) petition, as well as her participation in reunification services? (4) Is the continued out-of-home placement of the children proper absent a jurisdictional or dispositional ruling on the supplemental petition, where the detention was grounded on facts alleged in the supplemental petition which was dismissed? (5) Have any other postappeal orders been made at which continued removal of the children and a plan of family reunification has been ordered?

b. *General Legal Principles Relating to Section 364*

Section 364 governs the conduct of review hearings in cases where the children were maintained in parental custody. That section establishes procedures for review hearings for a minor who has been adjudged a dependent but has been placed back in the custody of one parent. (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 650.) "When proceeding under section 364, because the child is in placement with a parent, the

20

[juvenile] court is not concerned with reunification, but with determining whether continued supervision is necessary in the family home." (*Ibid.*, citing § 364, subd. (c).)

At the section 364 review hearing dependency jurisdiction must be terminated unless the conditions that created the need for supervision still exist or are likely to exist if supervision is discontinued. (§ 364, subd. (c); *In re T.S.* (2020) 52 Cal.App.5th 503, 512; see *In re Gabriel L.*, *supra*, 172 Cal.App.4th at p. 650, citing Cal. Rules of Ct., rule 5.710(e)(2).)

The juvenile court makes its determination based on the totality of the evidence before it, including the reports of the social worker, who is required to make a recommendation concerning the necessity of continued supervision. (*In re N.O.* (2019) 31 Cal.App.5th 899, 922–923.)

c. *The Court's Authority to Modify Previous Orders at a Family Maintenance Review Hearing*

Mother argues that at a section 364 review hearing, the juvenile court lacks authority to do anything except that which is provided in section 364, subdivision (c), that is, either terminate jurisdiction or extend family maintenance services for an additional six months, and that it lacks authority to remove children at such a hearing without a prerequisite supplemental petition under section 387. This statement is correct to the extent that ordinarily a court either terminates jurisdiction or extends maintenance services at a section 364 hearing, as a general matter, but this is not universally true.

21

"The Legislature has defined the juvenile court's statutory authority to modify its previous orders in Welfare and Institutions Code, article 12, sections 385 through 391." (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 111 (*Nickolas F.*).) In *Nickolas F.*, the juvenile court terminated services and ordered a section 366.26 hearing based on the social worker's report recommending that action due to the discovery of the true nature of the father's physical abuse of half-siblings of the minor in Arizona, for which he was incarcerated. (*Nickolas F.*, *supra*, at pp. 98–99.)

In *Nickolas F.*, despite the failure to file a section 388 petition, the Agency argued that the modification was properly ordered based on new evidence, and that even if that were not a proper basis, section 385 provided the juvenile court with authority. (*Nickolas F.*, *supra*, 144 Cal.App.4th at p. 105.) The reviewing court agreed, concluding that "the juvenile court has the authority pursuant to section 385 to change, modify or set aside its prior orders sua sponte." (*Id.*, at p. 116.)

Section 385 provides that "Any order made by the court in the case of any person subject to its jurisdiction may at any time be changed, modified, or set aside, as the judge deems meet and proper,[7] subject to such procedural requirements as are imposed by this

---

[7] We observe that the phrase "meet and proper," which is so deeply embedded in the law as to have evaded interpretation, is vague. It is found in legislation relating to default judgments and dismissals of civil actions (Code Civ. Proc., §§ 580, 581) as well as in sections 385 and 775. Respecting civil actions, the language is commonly included in the prayer for relief in legal pleadings, where litigants pray for any and all relief which is "meet and proper." In this context, it has been held to mean that ""'[t]he relief granted to the plaintiff, if there be no answer, *cannot exceed*, that which he shall have *demanded* in his complaint; but *in any other case*, the court may grant him any relief consistent with

article." In *Nickolas F.*, the reviewing court observed that "All courts have inherent

powers that enable them to carry out their duties and ensure the orderly administration of

justice. The inherent powers of courts are derived from California Constitution, article

VI, section 1, and are not dependent on statute. [Citations.] The juvenile court derives its

general judicial authority from the California Constitution." (*Nickolas F.*, *supra*, 144

Cal.App.4th at p. 110.)

The court reasoned in *Nickolas F.* that "When the juvenile court contemplates

modifying a previous order, either pursuant to a request by a party or on the court's own

motion, section 385 does not impose any particular procedural requirement described in

the case made by the complaint and embraced within the issue." (Code Civ. Proc., § 580.)'" (*Valenzuela v. Valenzuela* (1959) 168 Cal.App.2d 565, 567.)

This interpretation is consistent with the definition of the term "proper" as found in Black's Law Dictionary (6th ed. 1990): "That which is fit, suitable, appropriate, adapted, correct. Reasonably sufficient. Peculiar; naturally or essentially belonging to a person or thing; not common; appropriate; one's own. *See also*, Reasonable."

For further explication of this archaic but still commonly-used phrase, we turned to the internet, where we learned the following: "Something is meet which is not only suitable but nicely adapted to the particular situation, need, or circumstances; the word usually suggests rightness or justness rather than an absence of incongruity; thus, a punishment of a childish offense may be suitable if it is in accord with the years and mentality of the child, but it is not meet unless it suggests due proportion between the offense and its penalty. [¶] Something is proper (see also DECOROUS ) which belongs to a thing on some justifiable grounds (as by nature, by custom, or by right reason). When, as often happens, fitness or suitability is stressed rather than natural or rightful association, proper then implies determination of fitness or suitability by logic, reasonableness, or good judgment." (https://www.writingtips.cc/fit-vs-suitable-vs-meet-vs-proper-vs-appropriate-vs-fitting-vs-apt-vs-happy-vs-felicitous/ [As of Nov. 21, 2025].)

This is a long way of saying that, in our interpretation, the phrase "meet and proper" as used in section 385, imports that the juvenile court has broad discretion, which must be exercised consistently with due process notice and opportunity to be heard, *and must be reasonable under the circumstances.*

23

Welfare and Institutions Code, article 12." (*Nickolas F.*, *supra*, 144 Cal.App.4th at p. 113.)  The only proviso is that the juvenile court must provide the parties with notice and an opportunity to be heard before reconsidering or modifying an order.  (*Id.*, at p. 98; see *In re R.M.* (2025) 111 Cal.App.5th 119, 133.)  "Where, as here, the court independently recognizes that it improvidently directed the Agency to provide reunification services to a parent, requiring that a party file a petition under section 388 before the court may modify the order, or worse, requiring that the parties comply with the erroneous order, would constitute a waste of time and resources.  [Citation.]  We conclude that in dependency proceedings, when the court recognizes that a previous order was erroneously, inadvertently or improvidently granted, it is not necessary that a party file a section 388 petition to provide the court with the authority to modify that order." (*Nickolas F.*, at p. 110.)

This court has adopted this reasoning, holding that a ruling based on an oral motion made by minor's counsel to terminate visits by grandparents was harmless under state law.  (*In re R.M.*, *supra*, 111 Cal.App.5th at p. 132.)  In *R.M.*, the juvenile court found that continued visits between children and their maternal grandmother would be detrimental to the children's physical or emotional well-being and ordered that maternal grandmother have no further visits.  The grandmother filed a section 388 petition to reinstate visits, but the petition was summarily denied on the grounds she had not stated any new evidence or changed circumstances, or that visits with her would be in the best interest of the children.  On appeal, the grandmother claimed the juvenile court erred in

24

terminating her visits upon the oral motion requesting that action was made by minors' counsel. (*In re R.M.*, at pp. 130–132.)  We disagreed there, and we now disagree here.

Section 385 authorizes the juvenile court to reconsider its previous orders providing that the parties received notice and an opportunity to respond.  Here, Mother received notice when minors' counsel made the oral motion in July 2024, and at subsequent hearings where minors' counsel reaffirmed that intention of proceeding, although she failed to follow through with the filing of a section 388 petition as directed by the court.  Nevertheless, Mother had two months of advance notice that a contested (that is, evidentiary) hearing would take place based on that oral request, and she had the ability to present evidence on her behalf.

We agree that the Department should have given advance notification of its intention to change its recommendation and to support the request for detention, as well as its failure to seek, predetention, issuance of protective custody warrants, or at a minimum, a detention report, prior to the hearing.  We also conclude that in light of the 11th hour and 59th second submission of the Department's amended recommendations, a continuance was in order.  The observance of these preremoval procedural requirements would have provided Mother with a more realistic idea of the type of evidence she would need to present or address at the hearing.  Nevertheless, while we do not condone the actions taken here, because of subsequent events, we find that the procedural errors were harmless in this matter, as will be more fully addressed in the next section.

The conclusion that the juvenile court had authority to order the detention at the section 364 hearing obviates the need to determine whether continued out-of-home placement is proper in the absence of a valid jurisdictional or dispositional ruling on the supplemental petition.

We now examine whether Mother's failure to promptly file a section 388 petition to seek return of the children, or to orally request prompt return of the children upon the dismissal of the supplemental petition, or even to request the children's return at the subsequent section 366.21 status review hearing, signaled her acquiescence in the removal.

d. *Mootness and Forfeiture*

We requested supplemental briefing on the potential issues of mootness and forfeiture based on postjudgment minute orders, copies of which we served on the parties. We have taken judicial notice of those minute orders. (Evid. Code, §§ 452, subd. (d), 459.) The minute order of March 4, 2025, reflects that the juvenile court conducted a six-month review hearing, continued the children in out-of-home placements due to findings that return of the children to Mother's custody would create a substantial risk of detriment and found that Mother's progress in alleviating or mitigating the causes necessitating placement was minimal. There is no indication that Mother objected to continued out-of-home placement or requested return of the children after dismissal of the supplemental petition, or that during the interim she filed a motion to reconsider the order of removal, or to modify it.

In response to our request for supplemental briefing, Mother argues that there was a standing objection to the removal, directing our attention to the filing of her notice of appeal, and arguing that the court's extension of reunification services was a "win" for the Mother. The Department argues Mother forfeited the claim because she did not object or raise the issue that the children should have been returned to her care when the section 387 petition was dismissed, and that she acquiesced in the removal by failing to challenge the factual basis for removal and receiving reunification services. We agree with the Department.

As we indicated in our request for additional briefing, we are concerned that the irregular removal proceeding may have been rendered moot by subsequent events, most notably, the subsequent hearing on October 29, 2024, at which Mother did not object to or appeal from the continued removal upon the dismissal of the supplemental petition, at which the court continued the out-of-home placement of the children, and the hearing on March 4, 2025, where Mother appears (in the absence of a reporter's transcript) to have acquiesced in the findings made at the six-month status review hearing pursuant to section 366.21, subdivision (e).

Mother describes the orders made at the section 366.21 status review hearing as a "win" because the court did not set a section 366.26 hearing. Far from being a "win," the subsequent findings of detriment precluding return of the children to her care undermines her argument that the original detention was erroneous, which is now moot.

It is well settled that when no effective relief can be granted, an appeal is moot and is subject to dismissal. (*In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315.) "'On a case-by-case basis, the reviewing court decides whether subsequent events in a dependency case have rendered the appeal moot and whether its decision would affect the outcome of the case in a subsequent proceeding.'" (*In re A.B.* (2014) 225 Cal.App.4th 1358, 1364, citing *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1055.)

"A case becomes moot when events "'render[] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief.'" [Citation.] For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks. [Citation.] [¶] This rule applies in the dependency context. [Citation.] A reviewing court must "'decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether [its] decision would affect the outcome in a subsequent proceeding.'" [Citation.] We review de novo the Court of Appeal's determination that this case is moot." (*In re D.P.* (2023) 14 Cal.5th 266, 276, citing, among other authorities, *In re N.S.* (2016) 245 Cal.App.4th 53, 60, and *In re Anna S.* (2010) 180 Cal.App.4th 1489, 1498.)

In the seminal case of *In re Jessica K.*, the mother's section 388 petition seeking return of her child was denied; at a subsequent hearing, mother's parental rights were terminated, and the mother appealed, indicating she was challenging the summary denial of the section 388 petition. Because the order terminating parental rights was not

28

challenged, it became final, and the reviewing court concluded that the subsequent order precluded it from granting relief on the denial of the section 388 petition due to mootness. The court stated, "In this case, mother appealed from the order summarily denying her section 388 petition, but did not appeal from the order terminating parental rights, allowing the termination order to become final. The failure to file a timely notice of appeal from the termination of parental rights order deprives us of appellate jurisdiction to modify that order. Accordingly, the parental rights termination order may not be vacated. No effective relief may be afforded mother even were we to find her appeal of the denial of the section 388 petition meritorious. Thus, the appeal is moot." (*In re Jessica K.*, *supra*, 79 Cal.App.4th at pp. 1316–1317.)

Other courts agree with the basic principle involved here. (See *In re A.B.*, *supra*, 225 Cal.App.4th at pp. 1364–1365 [mother appealed from an original jurisdictional/dispositional finding and order, but before the appeal from that judgment could be decided, a subsequent petition pursuant to section 342, was filed and adjudicated].) In *In re A.B.*, the court concluded that no effective relief could be provided to mother by reversing jurisdiction under the original petition because jurisdiction was established independently under the subsequent petition on entirely new and independent facts. (*In re A.B.*, at p. 1364.)

Mother opposed the removal of the children at the family maintenance review hearing and appealed that order. However, subsequent thereto, the juvenile court made findings that return of the children to Mother's custody would be detrimental and that

29

Mother's progress in mitigating or alleviating the causes that led to removal had been minimal. Those findings still stand. The children have been placed out-of-home for nearly a year now, and it would be improper for us to reverse the removal in light of the more recent findings that return to Mother would pose a serious and substantial risk of harm to their well-being. Nevertheless, we have "'inherent discretion'" to reach the merits of the dispute (*In re D.P.*, *supra*, 14 Cal.5th at p. 282) and have done so here to prevent, so far as is practical, future deviations from procedural prerequisites, given the importance of the interests of all involved.

This conclusion obviates the need for us to determine whether the legality of the detention is independently reviewable, as well as whether there have been other postappeal orders made in which continued removal of the children and a plan of family reunification has been ordered.

The findings and orders made at the six-month review hearing following removal of the children are now final and preclude us from providing effective relief.

e. *Whether Remand is Required Because Compliance with ICWA is Incomplete*

Mother argues the juvenile court's finding that ICWA does not apply must be conditionally reversed due to inadequate inquiry of extended relatives. The Department argues that a conditional reversal is unnecessary because Mother's family was from Mexico and this appeal was not taken from a termination of parental rights. The Department has the better argument though for different reasons.

ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family. (25 U.S.C. § 1902; see *In re Isaiah W*. (2016) 1 Cal.5th 1, 7–8.) In any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child," the Indian custodian and the Indian child's tribe have the right to intervene and may petition the court to invalidate any foster care placement of an Indian child made in violation of ICWA (25 U.S.C. §§ 1911, subd. (c), 1914; see § 224, subd. (e)).

Under ICWA, a "'foster care placement'" means "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated." (25 U.S.C. § 1903 (1)(i).) In other words, ICWA requirements apply only when a child is to be placed in foster care—by whatever means—and not when a child remains in the parental home.

Section 224.2 codifies and expands on ICWA's duty of inquiry to determine whether a child is an Indian child. "Agencies and juvenile courts have 'an affirmative and continuing duty' in every dependency proceeding to determine whether ICWA applies by inquiring whether a child is or may be an Indian child. (§ 224.2, subd. (a).) This 'duty to inquire begins with the initial contact, including, but not limited to, asking

the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child.'"  (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1131–1132.)

Under current California law, the "duty to inquire begins with [the] initial contact [citation] and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child."  (*In re T.G.* (2020) 58 Cal.App.5th 275, 290, citing § 224.2, subds. (a)-(c).)  That duty to inquire is *not limited* to asking the reporting party if they have information that the child may be an Indian child.  (§ 224.2, subd. (a).)  The Department is required to ask extended relatives about possible Native American ancestry where the "child is placed into the temporary custody of a county probation department pursuant to" sections 306 or 307, or by a protective custody warrant pursuant to section 340.  (§ 224.2, subd. (b)(2).)

Section 306, subdivision (b), requires departmental inquiry into Indian heritage pursuant to section 224.2, "[u]pon receiving temporary custody of a child."  Here, the children were originally placed with Mother, so Department received temporary custody of the children pursuant to section 306 when Mother surrendered them to the Department upon the juvenile court's order of detention.  At that point, the Department's inquiry duty under section 224.2, subdivision (b) was triggered.

Removal of children from their parents and the receipt of the children by the Department is the true triggering event for inquiry into possible Native American ancestry, as seen by the plain language of both ICWA and Cal-ICWA.  By its plain language, ICWA states that it applies when a child is placed in foster care or an adoptive

placement:  "The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards *for the removal of Indian children from their families and the placement of such children in foster or adoptive homes* which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. § 1902, italics added.)

Because the children were not removed from Mother's custody or received by the Department until September 2024, the Department's duty of inquiry was triggered only in September 2024.  We assume that the Department will inquire in earnest of Father's and Mother's relatives now that the children have been received by and under the supervision of the Department.  The court ordered reunification services for Mother, so a conditional reversal is not necessary at this stage.  "[W]hen a social services agency accepts its obligation to satisfy its inquiry obligations under ICWA, a reversal of an early dependency order is not warranted simply because a parent has shown that those ongoing obligations had not yet been satisfied as of the time the parent appealed."  (*In re S.H.* (2022) 82 Cal.App.5th 166, 171.)

We therefore direct the juvenile court to vacate the finding that ICWA does not apply.

**DISPOSITION**

The order detaining the children made at the family maintenance review hearing is affirmed. The juvenile court is directed to vacate the finding made at the family maintenance review hearing that ICWA does not apply. The Department and the juvenile court are directed to continue inquiry in possible Native American ancestry with maternal and paternal relatives.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

CODRINGTON
J.

FIELDS
J.